COWART, Judge.
This is an appeal by a mother from an order permanently terminating her parental rights to her child, T.S.
T.S. was born two months premature on June 16, 1982, with numerous severe medical complications including heart and respiratory problems and sudden infant death syndrome. She required special medication, respiratory and heart monitors and twenty-four hour attention and was designated a special needs child.
The mother’s maiden name is Carolyn Elaine Williams. She is married to a man named Smith but her two children are fathered by Billy Ray Huff. When T.S. was born the mother was considered the sole parent. She was also the sole support of her two year old boy-child, Billy Huff, with whom she lived in a rundown one bedroom rental unit, with no stove and no refrigerator. The mother is Black and overweight, and has little education, no job skills, no car and no money.
When T.S. was about three months old and it was time for her to leave the hospital she was still in need of a heart monitor and constant special medical attention. The Department of Health and Rehabilitative Services (HRS) determined that the mother was “currently financially stressed” and unable to provide the basic care and specific medical care the child needed. HRS also felt the mother had not visited her baby in the hospital as often as she should have. The mother had been told the baby had *679 “brain damage” and she was reluctant to visit and become attached because she feared it was going to die. On September 10, 1982, HRS filed a petition to have T.S. adjudicated a dependent child. At the hearing on that petition the mother and the natural father, Billy Ray Huff, appeared and consented to the adjudication because they knew they could not financially provide the special medical care and attention needed by T.S. The court withheld adjudication, placed the child in the temporary custody of HRS and set a disposition hearing for October 29, 1982. However, on September 24, 1982, in the absence of the mother, the court adjudicated the child to be dependent[1] continued the temporary custody of the child to HRS and ordered the mother to enter into a performance agreement[2] with HRS. Ominously, the September 24, 1982, order also stated “refer to ARS[3] unit.”
HRS took the baby from the hospital and placed it in a foster home[4] located some distance from where the mother lived.
Ms. Joan M. Adkins, a foster care counselor with HRS determined that the mother had problems including (1) a lack of emotional bonding to the child, (2) inability to provide the baby’s needed medical care, (3) inability to understand the child’s special needs, and (4) inability to provide an adequate home environment. Ms. Adkins approached the mother with a performance agreement dated October 22, 1982, requiring (1) that the mother attend and successfully complete a parenting course of classes, (2) that the mother attend eighty percent of certain medical counseling sessions and provide reports to the court and HRS thereon, and (3) that the mother obtain and maintain an adequate apartment and necessary toys, furniture, clothing, food, etc., for two children. The mother was made to understand clearly that she would not be given the actual custody of her child T.S. unless she performed all of the “tasks” assigned to her by HRS and set forth in the performance agreement. She was fearful she might be unable to perform her assigned “tasks” and for this reason she refused to sign the performance agreement. A second performance agreement dated March 25, 1983, was also tendered by HRS. The mother again refused to sign for the same reason. When asked why she did not sign the agreements, she said: “I didn’t know whether or not ... I could stand up to it but I said I would try to the best of my ability to do, you know, the best I could.”
Although the mother never signed the two proposed performance agreements, or two related “visitation contracts,” HRS used them as a guide in dealing with the mother. The agreements squarely placed the “responsibility for regular and ongoing visitation between the child and the parent” equally upon the HRS counselor and the parent. The agreements recognized that the mother did not have transportation and the agreements specifically provided that the mother would be transported by the HRS foster care counselor for visitations, medical consultations and training sessions. The HRS visitation “contract” of March 25, 1983, permitted the mother to visit with her baby for one hour every two weeks but every week if she complied with the performance agreement.
During the months from September, 1982, to August, 1983, the mother tried to meet the terms dictated by her HRS counselor:
PARENTING TRAINING: HRS in one of the proposed performance agreements required the mother to successfully com- *680 píete a BETA[5] parenting course. Apparently BETA required attendance of a twelve class course of three days a week for four weeks. In March, 1983, the mother attended three of the twelve sessions given that month. In April she attended three of the twelve sessions given that month and in May she attended six of the twelve sessions given that month. Many of the sessions covered the same class. The mother’s impression was that she went to 10 of 12 sessions, missing two when she had the flu. When the mother was told that to get a BETA certificate she had to attend, in June 1983, every one of twelve consecutive different classes, she gave up and did not get a certificate. However, in September 1983, one night each week for twelve weeks the mother took her son with her and walked to and from a vocational school and attended and successfully completed an HRS Developmental Services parental training course. HRS gave a certificate indicating that the mother had successfully completed 20 hours of training in Child Development Using Behavior Modification Techniques.
HOUSING: Because HRS told her she needed more adequate housing, the mother applied for housing assistance and applied for many apartments. She also applied to the Housing Authority. After going to sessions required by HUD (Housing and Urban Development) about June of 1983, the mother moved into government owned housing having three bedrooms and a bath and a kitchen. She got furniture from Goodwill. Because HRS told her she should have them the mother also bought a baby bed and toys for T.S. HRS admits the mother met HRS requirements for adequate housing.
EMPLOYMENT: One performance agreement required the mother to actively seek employment. The mother worked from January until April of 1983 as a nurse’s aide but was not otherwise employed. The juvenile judge reviewed the status of the case[6] in September of 1983 and again referred the case to the Adoption and Related Services Unit of HRS and also ordered “the mother to obtain full-time employment immediately — court requires employment prior to any future return of custody.”[7] Seeking employment the mother went to CETA but was told that she would have to obtain a general educational development (GED) certificate before she could enter their program. The mother then applied to Temporary Helpers to try to find a job through them. Because of her nervous condition the mother applied for a social security disability but that application was turned down after a hospital examination. The mother next applied to Vocational Rehabilitation which agency had the mother examined by a psychiatrist (Dr. Michael Gutman) who found the mother had a vocational handicap, specifically, difficulty maintaining mental and emotional equilibrium. Vocational Rehabilitation recommended that the mother attend Southwest Mental Health Clinic for counseling sessions and the mother attended those sessions. The mother cannot lift or stand for long periods of time. She also has medical problems. At the direction of a psychiatrist and a medical doctor (Dr. Hang Chon) the mother takes Stelazine which makes her drowsy and limits her ability to work. Because of her combined physical, mental, emotional, psychiatric and medical problems the mother has an established vocational disability, is not able to work regularly and is not capable of continued gainful employment especially in view of her *681 need to care for her older child, Billy Huff. For herself and her child Billy, the mother receives monthly $132 Aid to Families with Dependent Children (AFDC), and $139 in food stamps. Her rent is $57 a month and her utilities about $70 a month.
The mother’s HRS counselor, Ms. Adkins, was concerned and frustrated by many things. (1) The mother would not sign the proposed performance agreements. (2) The mother did not complete the BETA course. (3) The mother did not punctually attend all HRS meetings, child visits, medical appointments, and other meetings as scheduled for her by Ms. Adkins. (4) The mother did not understand or react to the special problems of T.S. as Ms. Adkins thought she should. (5) When the mother visited her baby the mother did not inquire as to the baby’s medical condition. (6) The mother was unable to have a psychiatrist, Dr. Wilder, or a doctor (Dr. Hang Chon) provide HRS with written reports as HRS required. (7) The mother failed to make and provide HRS with a written report on her parenting classes. (8) The mother fed her son, Billy, coke and potato chips and french fries rather than skim milk and powdered skim milk and Billy wore torn clothes and no underwear.
The mother came to be dissatisfied with Ms. Adkins. The mother complained that Ms. Adkins “didn’t think I was a capable person” and that Ms. Adkins was always “telling me that I should give the baby up for adoption and stuff.” The mother thought that Ms. Adkins had her mind already made up “the second time we went to court” (September, 1983), and believed that Ms. Adkins “wasn’t going to never, you know, give me the baby back.” The mother said that she and Ms. Adkins
talked several times, and all the times that we talked, she said, you should give the baby up and, you know, leave her have, you know, a home and all this. So what could I do, you know. I’m trying— this lady is with me every day and telling me to do this and the court is telling me that — you know, get a [job] — she done wrote up the performance agreement for me to get adequate housing, all this stuff, and I’m trying this for her every day, and here she comes up there telling me, give the baby up for adoption; what else can I do. You know, I’m fighting a losing battle with her. And after we went to court in September, I had called her and told her — asked her would she come and pick me up, that I didn’t have a way to come and see [T.S.] ... and I didn’t have money, and she — she was out of the office. But the second time I called and she was there, she never did show up. She never — that’s why I didn’t go and see that baby the last six months when we came to court. If I’d had another worker, I could have went to see her every time.
The mother was concerned about Ms. Adkins because “she [Ms. Adkins] took my sister’s children — she [Ms. Adkins] came to the house and told her [the mother’s sister Patricia Parson] definitely, that she wasn’t getting those children back.” The mother believed that the only reason her sister’s children had not been already adopted was because HRS had taken Ms. Adkins off, and put another counselor (Daisy Lynum) on, her sister’s case.
The conflict between Ms. Adkins and the mother peaked immediately after the September, 1983, court review. Because Ms. Adkins had encouraged the mother to voluntarily give her baby up for adoption and because of the mother’s perception of the worker (Ms. Adkins “didn’t understand ... about parenting a child because she never had a child ... [she] did not believe in me, she did not think I was capable and it wasn’t no use”), the mother asked Ms. Adkins’ HRS supervisor to assign her to another counselor. In order to avoid further contact with Ms. Adkins the mother also told the HRS supervisor that she “was going to try to get my own transportation” to visit T.S. Thereafter Ms. Adkins did not see the mother; there was but four telephone calls between Ms. Adkins and the mother, transportation was not furnished and the mother was unable to get transpor *682 tation for visitation.[8] Ms. Adkins transferred the case to the HRS adoption and related services unit in December, 1983.
Sometime before January 5, 1984, an HRS staffing committee made the decision that the mother’s parental rights should be terminated and T.S. placed for adoption. A petition was filed on January 24, 1984. Essentially it alleged that the mother lacked adequate parenting skills, resources or capabilities to care for her baby and that if the baby was returned to the mother it would be neglected. It also recited the mother’s infrequent visitation with her baby in its foster home and that the mother had failed to substantially comply with the obligations and responsibilities required of her by the performance agreements and that the mother had abandoned T.S.
During the nine or so months following adjudication of the child to be dependent on September 24, 1982, and while the mother was busy attempting to comply with the HRS performance agreement requirements, the baby, T.S., outgrew the breathing and heart problems with which she was born and did not need heart monitoring after she was about one year old (June, 1983). However, in February 1984, after the petition for permanent termination of parental rights was filed, HRS had the child extensively examined by a pediatric neurologist (Dr. Michael A. Pollack) and clinical psychologist (Dr. Edmund S. Bartlett and Gini W. Cucuel) and by teachers and administrators of its own Developmental Services Program (Harold H. Geiger and Sheri Stires-Martin). Those examinations and evaluations revealed that T.S. was developmentally delayed and functioned in the mental deficient range described as mildly or moderately mentally retarded. It was also determined that she had autistic[9] tendencies although children were not normally labeled autistic until three years of age and T.S. was but twenty months of age. The evaluation of the parent training program of the HRS developmental services program was that T.S. was a special needs[10] child, requiring a special family with an educational setting providing the stimulations and structure needed to decrease the probability of future self-destructive tendencies.
The hearing on the petition covered many aspects of the mother’s successful and unsuccessful efforts to meet the “tasks” HRS required of the mother in the performance agreements and the child’s newly discovered needs, but the hearing somewhat centered on the mother’s failure to visit T.S. in the home of the foster parents after August 4, 1983. The performance agreements placed the responsibility for visitation on both the HRS counselor and the mother. The agreements placed the entire responsibility for providing the necessary transportation on HRS. At the final hearing the HRS attorney was critical of the mother’s depending on the HRS counselor “to chauffeur her all around Orange County, to assist her in every little menial task that came about, as well as take her to all of her visits that she has attended.” The HRS attorney repeatedly asserted his personal disbelief of the mother’s testimony saying “well, she lied. She’s lied terribly”, “ — I simply don’t believe her testimony — .” The HRS attorney argued that the order of *683 September 24, 1982, adjudicating the child dependent was res judicata after that point; that the mother had failed to cooperate with HRS by refusing to enter into performance agreements; that she had failed to substantially perform the performance agreements and that the mother’s small number of visits with the child in the foster home was sufficient evidence of abandonment as defined in section 39.01(1), Florida Statutes. The trial court accepted the HRS argument and found that T.S. was a neglected child by virtue of the original adjudication; that the mother had failed to comply substantially with the performance agreement[11] and that the mother had abandoned T.S. because she had not visited her baby on any occasion since August 4, 1983, a period in excess of six months. By final order dated March 8, 1984, the mother's rights were “declared permanently forfeited,” and the child was permanently committed to HRS for subsequent adoption.[12]
Interestingly, after the final order in this case and as a result of a petition for rehearing, HRS considered placing T.S. with the mother’s parents, Mack and Addie Mae Williams, and a meeting occurred at which an HRS employee showed a video tape of an autistic child so that the grandparents could learn of the special needs (“a language rich and stimulating environment”) and the ramifications of having a possibly autistic child. The Williams’ stated that none of their fifteen children were slow or had any unusual behavioral problems and they questioned whether T.S. had learning problems. Observing the child Mrs. Williams stated, “don’t look like nothing is wrong [with her]”. HRS concluded that the Williams’ were uncooperative and resistant to recognizing learning problems and recommended against the placement.
The final order in this case has three bases, viz: the mother neglected the child (§ 39.41(l)(f)l.a); the mother failed to substantially comply with a performance agreement (§ 39.41(l)(f)l.d.); and the mother abandoned the child (§ 39.41(l)(f)l.a.).
It is obvious from the facts that the mother has never neglected her baby. Section 39.01(27) defines neglect as intentionally depriving a child of necessary food, clothing, shelter or medical treatment or significantly impairing the child’s physical, mental or emotional health. In this case the child has not been neglected either while it was in the hospital or while it has been in the HRS provided foster care. In addition, the adjudication of dependency on the basis of neglect does not satisfy the inquiry, proof or findings necessary to establish neglect justifying a permanent termination of parental rights. In Interest of L.T. and C.T., 464 So.2d 201 (Fla. 5th DCA 1985).
As a statutory ground for permanently terminating parental rights, section 39.41(l)(f)l.d., Florida Statutes, refers to a parent’s failure to substantially comply with “a performance agreement entered into under s. 409.163.” Section 409.-168(2)(g) defines the performance agreement as a document “signed by the parent.” Section 409.168(3)(b) confirms that the statute contemplates a performance agreement “agreed upon and signed by the parties involved. ” (emphasis supplied) The mother in this case never signed a performance agreement. Section 409.-168(4)(a), Florida Statutes, directs a course of action for HRS when a parent will not participate in preparation of a performance agreement but that course of action was not followed by HRS in this case.
The final order found that the mother’s failure to visit the baby in the foster home for a period in excess of six months after August 4, 1983, was sufficient evidence of abandonment as defined in section 39.01(1), Florida Statutes. But after June, 1983, the real problem was not whether the mother had the ability and neglected to visit her baby at the foster home: the problem was that HRS should have returned the baby to its mother at that time because the baby no longer needed the *684 special medical care that was the basis for it originally being placed in the foster home. If HRS had returned the baby to the mother in June of 1983 there would have been no visitation problem. In this case the mother has always wanted her baby. She wanted her baby when it was born; she wanted it at the dependency proceeding; she wanted it during the nine months she tried to meet HRS requirements; she wanted it at the final termination hearing and by this appeal she is still fighting for her baby.
The real problem here is that of a mother who did not have the financial ability to provide special medical attention needed by her child at birth. If it is sociopolitical policy for the government to fund the providing of needed medical attention to children whose parents cannot afford that care, it can and should be done without forfeiting the parent’s parental rights. Parental rights to children should not be forfeited merely because of the indigency of the parent. The following dialogue occurred:
BY MR. LYKKEBAK:
Q. If this child was returned to your custody, how would you get around and do the things that need to be done for [T.S.], get her to her doctor’s appointments, get her to the parent training, get her to all of the medical needs that she has?
******
A Well, I can’t answer that question, because I don’t know whether — how—I would have to see how much money— how much financial — how the financial status would be if I got her back. I don’t know that.
Q Well, do you think you’re going to get some money for her if you get her back?
A Not really.
Q You think somebody is going to pay you to take care of her or what?
A Don’t they pay the foster people? I’m pretty sure they — I’m pretty sure that they — they get something.
Q (Simultaneous Speech) It doesn’t work the same way, ma’am, when it’s your own child.
A I know. I know. If I get her back, the only thing they’re going to probably do is put her on my welfare and I’ll probably get about 40.00 or 50.00 more dollars, wherein they’re paying the foster parents almost $200.00 a month to take care of her. Don’t you think they have sufficient enough funds to do it with?
When the mother was pressed about her lack of understanding of her child’s medical problems she replied:
A Well, I knew that she had some problems because, you know, at first they had said she had brain damage and stuff, but, you know, I wasn’t aware, you know — I know that she would have problems and, no, I’m not the greatest person in the world, but I will — I try to deal with it. I’m not saying, you know, that I — I’m just going to be the perfect person, because I — you know, financially— really, I'm not able financially, maybe, to give her the kind of home that her foster parents has given her, but I’ll try to do the best that I can with her and her problems.
The order permanently terminating the mother’s parental rights is REVERSED.
COBB, C.J., and DAUKSCH, J., concur.

. Under section 39.01(9)(a), Florida Statutes, this constituted a legal adjudication that T.S. was “found by the court to have been abandoned, abused or neglected by his parents or other custodians.”

. See § 409.168, Fla.Stat.

. ARS apparently refers to the Adoption and Related Services Unit of HRS.

. This means that the child’s basic and special medical needs were being provided at public expense in the custody and care of persons approved, supervised and paid by HRS. See § 409.165 and 409.175, Fla.Stat.

. Birth Education Training and Acceptance, an independent service agency providing parenting education.

. See § 409.168(3)(f), Fla.Stat.

. The anomaly of requiring the mother to get a job in order to get her baby back and at the same time signaling for a permanent termination of the mother’s parental rights was not entirely lost on the mother who at the final hearing observed "the last time we went to court, the judge — the only thing the judge told me was to get employment, and I was going through Vocational Rehab. And that’s why I don’t understand why they put the baby up for adoption when I was going through Vocational Rehab to get a — you know, a thing for disability”

.When asked why she did not visit and deliver 1983 Christmas presents to T.S., the mother explained:
A Because I didn’t have the funds and things to deliver it with.
Q Didn’t have the what?
A I didn’t have the sufficient funds. I called Joan and asked Joan would she take me to see her so that I could deliver them.
Q Ma'am, this . may be a hard question. Don’t you have any friends at all?
A Not really. Not when it comes to money.
Q Nobody with a car to ever give you a ride even one time?
A Well, I’ve asked. I haven't gotten any results.

. Autism is a behaviorial disorder or disability the symptoms of which are an absorption in self-centered subjective mental activity often accompanied by marked withdrawal from reality.

. This was the second time that T.S. had been described as a special needs child. She had been so labeled while in the hospital. These words have a technical meaning in the state's social and economic assistance programs. See § 409.166(2)(a), Florida Statutes.

. See § 409.168 and § 39.41(l)(f)l.d., Fla.Stat.

. See § 39.41(l)(f), Fla.Stat.