479 So.2d 740 (1985)
In the Interest of B.W., J.W., and M.W., Minor Children.
William H. WIRSING, Appellant,
v.
STATE of Florida, DEPARTMENT OF HEALTH & REHABILITATIVE SERVICES, Appellee.
No. 84-844.
District Court of Appeal of Florida, Fifth District.
July 18, 1985.
On Rehearing December 20, 1985.
C. James Dulfer, Central Florida Legal Services, Inc., Daytona Beach, for appellant.
Jim Smith, Atty. Gen., and Eric J. Taylor, Asst. Atty. Gen., Tallahassee, for appellee.
DAUKSCH, Judge.
This case involves an appeal from an order of permanent commitment to the Department of Health and Rehabilitative Services of three minor children and the severence of parental rights of the natural father.
*741 William H. Wirsing, the natural father of three minor children, had his parental rights terminated following a permanent commitment hearing. In November 1979, dependency petitions were filed with the Circuit Court of Volusia County alleging that each child was abandoned, abused and neglected by their mother. The childrens' mother apparently was unable to responsibly care for the children at the time these petitions were filed. At that time, the father was serving time in the Lowell Correctional Institute for a burglary conviction. An order adjudicating them dependents was entered on December 12, 1979. The children were five months, three years and five years old, respectively, at the time of this initial adjudication.
By order dated July 21, 1981, the three children were placed back in the mother's custody. The legal custody remained with H.R.S. The mother was unable to care for the children and they were again placed in foster care. On August 26, 1982, William Wirsing entered into a performance agreement providing that custody of the children would be returned to him if he substantially complied with several conditions. Two days after this agreement was entered into, William Wirsing was arrested for armed burglary and sexual battery. He pleaded guilty to the sexual battery charge and was sentenced to twenty years in prison. These criminal offenses had occurred on August 24, 1982. H.R.S. filed petitions for permanent commitment on November 7, 1983. After final hearing the court entered its order of permanent commitment severing all the father's parental ties with the children. The attention devoted by this father to his children consisted principally of letter writing. From September 1982 to January 1983, Mr. Wirsing wrote the H.R.S. case worker in charge of his children twice concerning their welfare. After April of 1983, Mr. Wirsing wrote his children at least eight times. In December, 1983, H.R.S. filed a petition for permanent commitment alleging that the father neglected and abandoned his children and that he failed to comply with his executed performance agreement. At trial, Mr. Wirsing's counsel stipulated that it would be in the best interest of the children if parental rights were severed and the children were placed for adoption.
In its order of permanent commitment, the trial court recognized the interest Mr. Wirsing exhibited in his children during his incarceration but stated that the father never contributed to the children's support even during the period he was on parole and had a job. The court ruled that Mr. Wirsing abandoned his children in every respect except for giving "lip service" to maintaining an interest in them through letters. The court further noted that by continuing to commit criminal acts, which Mr. Wirsing knew, or should have known, would result in his incarceration and the removal from his children, he has demonstrated a lack of interest in the welfare of his children. This was an indicator of his intent to abandon them.
Whether one does or does not commit a crime is a purely voluntary act. When one commits a crime he is deemed to practically agree to suffer the consequences, all of them. It is cruel and inhumane to force children to rely upon as a father a person who has chosen to spend his life in prison and only sends letters to purport to fulfill his role as a father. A father nurtures and supports, he guides and uplifts. A father is available and willing to give of himself in order to raise his children to be whole persons who are prepared to face the world and work in it and contribute to it while enjoying all that the world has to offer. Children cannot do that without the assistance of parents. It is the duty of all of us to help all of the children to their best ends. If the natural parents fail, as the parents here have failed, then society, through legislative enactment, has provided a way to come to the rescue of abandoned children. It is more noble to provide for the immediate and lasting needs of neglected and abandoned children than to preserve some undefined wishes in some nebulous future for a biological father who will be in prison for all the time these children are children. The legislature recognized this, H.R.S. recognized *742 this, both trial attorneys recognized this, the trial judge recognized this, and we recognize this by affirming the judgment.
AFFIRMED.
COBB, C.J., concurs.
COWART, J., dissents with opinion.
COWART, Judge, dissenting:
This court is affirming the permanent termination of the parental rights of a father to his three children. The HRS petition for permanent commitment is based on allegations that the father neglected his children (§ 39.41(1)(f)1.a., Fla. Stat.), the father failed to substantially comply with a performance agreement (§ 39.41(1)(f)1.d., Fla. Stat.), and that the father abandoned his children (§ 39.41(1)(f)1.a., Fla. Stat.).
The HRS petition filed November 8, 1983, alleged as the factual basis for the neglect charge that on December 12, 1979, a juvenile court had sustained the allegations in a Dependency Petition that the father had neglected his children. The 1979 petition and order were entered into evidence as proof of these allegations. As a matter of law on their face, both the allegation and proof are an insufficient basis for forfeiting the father's parental rights on the ground of neglect. See T.S. v. State Dept. of Health and Rehabilitative Services, 464 So.2d 677 (Fla. 5th DCA 1985); In the Interest of L.T., 464 So.2d 201 (Fla. 5th DCA 1985); In the Interest of A.D.J., 466 So.2d 1156 (Fla. 1st DCA 1985).
The father was unable to perform the performance agreement in question because two days after he signed it on August 26, 1982, he was arrested and subsequently charged and sentenced to prison where he has been ever since. The statute in question provides that if "the failure to comply with the performance agreement is the result of conditions beyond the control of the parent or parents, such failure shall not be used as grounds for permanent commitment."
The charge of abandonment was based on the factual allegation that the father "neither communicated with nor supported the child from April, 1983" to the filing of the petition on November 8, 1983. The father was in prison confinement during this period of time and the children were in the legal custody of HRS and the actual custody of foster parents, a couple whom the father had originally asked to care for his children while he was earlier incarcerated. The foster parents were willing to continue to care for the children on an "indefinite basis" but were also willing to adopt them if HRS was able to permanently terminate the parents' rights.
In this case it is conceded that the father dearly loves his children and no one has even suggested that he has ever intended to voluntarily and permanently relinquish his parental rights, the only true meaning of the word "abandonment." See Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983) and the dissent in In the Interest of K.A.F., 442 So.2d 365 (Fla. 5th DCA 1983). HRS relies on the statutory definition of abandonment in section 39.01(1), Fla. Stat., which describes "a situation in which a parent, who, while being able, makes no provision for the child's support and makes no effort to communicate with the child for six months or more." (emphasis supplied)
If the father's prison confinement does not alone prove his indigence and inability to provide monetary support for his children that fact is clear from his dependency affidavits which were accepted by the court as the basis for appointing counsel to represent the father in this case. The record also shows that in this case, as is apparently customary[1] under the usual HRS performance agreements and permanent placement plans, HRS and the foster parents assumed "responsibility for regular and on-going visitation between the child(ren) and the parents " and that "every effort will *743 be made by [HRS] to arrange visitation." In this case the father was available for visitation at Avon Park, Florida, but HRS never arranged visitation by his children.[2] The record also shows letters from the father dated June 7, 1983, June 16, 1983, October 14, 1983, December 22, 1983, February 8, 1984 and February 29, 1984, to HRS caseworkers concerning his children. The record also shows long letters from the father to his children dated June 7, 1983, August 16, 1983, December 22, 1983 and February 29, 1984, as well as Christmas cards and Valentine cards.[3] The father not only made more than "marginal efforts" to communicate with his children during the six month period in question, he did in fact communicate with them. The father also wrote the children's school inquiring about the children's progress. Thus, the record clearly shows the father's inability to visit and communicate other than as he had done and is clearly contrary to the clear and convincing proof constitutionally required in such cases. See Hinkle, supra, and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
The trial court noted that the father's appointed "counsel stipulated at the inception of the hearing that the best interests of said children would be served by their placement for adoption." Whatever the father's counsel intended to accomplish by this stipulation, he should realize that based on it, HRS argued successfully before the trial court and before this court that this concession amounted to a consent and waiver and concluded the matter against the father. Counsel for the father was not appointed by the court for the purpose of conceding anything against the father's interest. It is crystal clear from the record that the father never agreed to the permanent termination of his parental rights and that counsel was appointed to effectively represent the father's interests.
However, this case typifies a social problem involving a myriad of identical situations and cases and difficult and fundamental legal issues that courts have a duty to consider on the basis of the legal principles involved. That duty is not met by the lame contention that each case must be individually considered. Under a rule of law all cases involving the same controlling factors and issues should be decided in the same way on the same legal principles.
The problem is that tens of thousands of parents are confined in prisons across the nation where they cannot meet their parental duties. If failure to perform parental duties is equated to neglect or abandonment justifying a forfeiture of parental rights, the parental rights of all such prisoner-parents are subject to permanent forfeiture. The question is: Can, or should, the inability to meet normal parental duties resulting from imprisonment in law be considered "abandonment" or "neglect" and used to justify the permanent forfeiture of the prisoner's parental rights so that other, "better" parents may adopt the prisoner's children when such action is perceived by some to be in the best interests of the child and society generally. The question is that simple, however easy, or tempting, it is to make it appear to be complex.[4] The hardhearted may say, as was said in this case, that the parent knew, or should have known, that as a result of the commission of criminal acts the parent could be incarcerated and thereby prevented from meeting parental duties and that by merely committing the crime the parent evinced such a lack of interest in the welfare of his children as to indicate an intent to abdicate (abandon) his parental rights. (Compare § 39.01(1), Fla. Stat.) These are fine words but in reality they are not true. Many *744 persons, being human and fallible, are commonly unable to perfectly conform their conduct to the minimum standards of organized society and frequently violate criminal laws without such criminal conduct evidencing any lack of love or concern for the welfare of their children or others affected by their misconduct. Few people indeed are so wise as to be able to accurately foresee all of the consequences of their conduct and to conduct themselves perfectly at all times; ordinary people, including parents, cannot, and do not, and it is an unwarranted and unfair fallacy to base an assumption as to a specific intention to abandon children because the children may be affected by the possible consequences of their parents' remote actions. Parents who have never violated the law and have never neglected their children in any particular should file all petitions to permanently terminate the parental rights of other, less fortunate and less perfect, parents. By Section 775.082, Florida Statutes, and other statutes, the legislature has set the penalties for violation of our penal statutes. These statutes do not include a forfeiture of parental rights and that penalty shall not be imposed or implemented by HRS nor approved by the judiciary.
The final legal answer to the question of whether prison confinement justifies the permanent forfeiture of a prisoner's parental rights in the best interest of the child and society, should be carefully deliberated because any principle justifying an affirmative answer will necessarily justify the permanent termination of parental rights by the government in every other situation where government agencies consider it to be in the best interests of the children and that will be a very dangerous precedent. While the best interests and welfare of the child is the sole guide in legal controversies relating to a child's custody, it has no proper place when the issue is the permanent termination of parental rights. The reason should be obvious.[5] It is in the best interests and welfare of every child to have the best possible parents. Whatever criteria is used to measure the desirable characteristics of ideal parents, obviously one-half of all parents are superior to, and better than, the other half. Any rule of law permitting permanent termination of parental rights based on the best interests of the child will justify the government taking all children away from half of all natural parents and giving them to the other, "better," half. HRS is in effect saying, "Look kid, we will find you some better parents." The order permanently terminating the father's rights in this case should be reversed because of insufficient allegations, insufficient proof and the violation of the father's fundamental constitutional rights.

ON MOTION FOR REHEARING
PER CURIAM.
In response to the appellant's motion for rehearing we issue this clarification of our prior opinion, because of the vigorous attacks upon it quoted in the press,[1] the misconstruction of that opinion as reflected by appellant's motion for rehearing, and intervening authority emanating from the Florida Supreme Court. This is not a landmark case, despite the efforts of the dissent, defense counsel, and the press to transform it into one. It is a routine case of statutory abandonment.[2] Along with numerous other such cases with which the appellate courts of Florida have dealt in the *745 past, it has been determined in accordance with the express provisions of Chapter 39, Florida Statutes. See, e.g., In Interest of K.A.F., 442 So.2d 365 (Fla. 5th DCA 1983); In Interest of R.V.F., 437 So.2d 713 (Fla. 2d DCA 1983); In Interest of C.M.H., 413 So.2d 418 (Fla. 1st DCA 1982); In Interest of J.F., 384 So.2d 713 (Fla. 3d DCA 1980); P.S. v. State, 384 So.2d 656 (Fla. 5th DCA 1980).
In our initial opinion, we responded to the dissent's attempt to characterize the appellant as a loving and caring father, a "human and fallible" Dickensien character guilty of some "misconduct," yet overflowing with devotion and concern for the welfare of his children. In so responding, we pointed out the true factual relationship between the appellant and his children  a relationship that forced Attorney Dulfer at trial to expressly concede that adoption was in the best interests of the children. Our allusions to the appellant's criminality and imprisonment, however, have given rise to the acrid accusation, in and out of court, that we have affirmed the arbitrary severance of the legal ties between three children and their loving father merely because he was incarcerated. This is a distortion of our original opinion and the action of the trial court.
We agree with the holding of the First District in Harden v. Thomas, 329 So.2d 389 (Fla. 1st DCA 1976), that imprisonment of a parent does not, as a matter of law, constitute abandonment of a natural child.[3] However, we also agree with the First District's holding the following year in Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977), that a long-term prisoner's failure to exercise minimal efforts at support and communication in regard to his children can constitute abandonment authorizing adoption.
Subsequent to the Turner opinion, the Florida legislature enacted the following definition of abandonment, effective October 1, 1978, a definition applicable to the instant case:
39.01 Definitions.  When used in this chapter:
(1) "Abandoned" means a situation in which a parent who, while being able, makes no provision for the child's support and makes no effort to communicate with the child for a period of 6 months or longer. If a parent's efforts to support and communicate with the child during such a 6-month period are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. (Emphasis added.)
In this case there was an express finding by the trial court that William Wirsing did not provide any support for his children after 1979, whether he was in or out of prison,[4] and while he had the ability to do so. There is a further finding that the communications to the children from the imprisoned father were only "lip service"  i.e., marginal.[5] These findings are presumed correct, and are encompassed by the emphasized provisions of section 39.01, Florida Statutes (1983), set forth above.
The trial court and a majority of this court have faithfully followed our constitutional obligation to apply the applicable statutory law of Florida. The dissent, on the other hand, is philosophically committed to the proposition that section 39.01(1), Florida Statutes (1983), incorrectly defines "abandonment," and to the proposition that the State of Florida lacks the moral and legal authority to implement the adoption of neglected and abused children pursuant to section 39.41(1)(f), Florida Statutes (1983). See the dissent in Carnrike v. *746 Dept. of Health & Rehabilitative Services, 442 So.2d 1093 (Fla. 5th DCA 1983), review denied, 450 So.2d 485 (Fla. 1984). This inflexible position is maintained even though the constitutionality of the abandonment definition in Chapter 39 has not been challenged in this litigation. In our view, a philosophy that would prevent the adoption of abandoned, abused and neglected children, no matter how extreme the circumstances, so long as the express consent of the offending parent is withheld, is immoral and archaic.
During the pendency of the motion for rehearing filed in this cause following our initial opinion, the Florida Supreme Court, regrettably, has issued its opinion in Burk v. Department of Health & Rehabilitative Services, 476 So.2d 1275 (Fla. 1985), holding that section 409.168, Florida Statutes (1983), requires the preparation and offering of a performance agreement to a parent in every case as a condition precedent to termination of parental rights, irrespective of the extent of any prior abuse, abandonment or neglect. As pointed out by the dissent therein, authored by Justice Alderman, joined by Chief Justice Boyd and Justice Ehrlich, the supreme court has opted for an interpretation leading to absurd consequences. Nevertheless, pending legislative corrective action, we are saddled with that interpretation. In the instant case, however, unlike the facts in Burk, a performance agreement was prepared and offered by HRS to the appellant parent, who executed it.
The trial judge based his order of commitment on abandonment, as previously noted, and also on the failure of the appellant to comply with the performance agreement due to his incarceration immediately subsequent to its execution. It is apparent that the latter ground was an improper one, since the appellant's failure was the result of conditions beyond his control. See § 39.41(1)(f)1.d, Fla. Stat. (1983). It is equally clear, however, from reading section 39.41 in its entirety, that abandonment is a basis for permanent commitment separate and independent of the parent's failure to comply substantially with the performance agreement. Section 39.41 provides, in pertinent part:
39.41 Powers of disposition. 
(1) When any child is adjudicated by a court to be dependent, the court having jurisdiction of the child shall have the power, by order, to:
* * * * * *
(f)1. Permanently commit the child to the department or a licensed child-placing agency willing to receive the child for subsequent adoption if the court finds it is manifestly in the best interests of the child to do so, and:
(a) If the court finds that the parent has abandoned, abused, or neglected the child; or

* * * * * *
d. If the parent or parents have failed, upon expiration of a performance agreement entered into under s. 409.168, to comply substantially with such agreement. If the court finds that the failure to comply with the performance agreement is the result of conditions beyond the control of the parent or parents, such failure shall not be used as grounds for permanent commitment... . (Emphasis added.)
Although the appellant's failure to comply with the performance agreement cannot be the basis for termination in the instant case, that fact does not preclude termination based on abandonment. This is clear from the use of the disjunctive "or" in the statute, emphasized in the language quoted above. The fact that performance of the agreement tendered by HRS to the parent is excused because of conditions beyond the parent's control cannot defeat the trial court's decision to commit based on a proper finding of abandonment pursuant to section (1)(f)1.a.
In the instant case, the trial judge found abandonment and that permanent commitment was manifestly in the best interest of the child. For the reasons set forth in this *747 clarification, we deny the motion for rehearing.
MOTION FOR REHEARING DENIED.
COBB, C.J., and DAUKSCH, J., concur.
COWART, J., dissents with opinion.
COWART, Judge, dissenting:
The issues in this case involve conclusions of law based on the material facts which are not in dispute. The father, Wirsing, was in prison in 1979 when his wife became unable to adequately care for their three children. The children were adjudicated to be dependent on December 12, 1979, and placed with HRS. The father corresponded with HRS and arranged for the children to be placed in th foster care of a married couple, Nick and Carol Ellis, whom the father had met while the couple were doing prison ministry work. During 1980 and the greater part of 1981 the father wrote the children at least every other week and the Ellis' brought the children to visit their incarcerated father about once a month. HRS reported to the juvenile court on January 9, 1981, that the father "is in regular contact with the Ellis'... ." The father was brought from prison to attend juvenile court review hearings on February 18, 1981, and July 15, 1981. In an order dated July 21, 1981, the juvenile judge found "(6) The father, despite his incarceration, has continually maintained contact with his children." When his circumstances in prison permitted, as it did from November, 1981, to February, 1982, the father called the children on the telephone every night at the Ellis' home. Except for two short periods of time when the mother had the children and the children were with other foster parents (the Lambs) the children have been in actual custody of the Ellis' since 1980 and continuously since April 26, 1983. About February, 1982, the father was paroled and went and lived in an apartment under the apartment in which his children lived with the Ellis'. During this parole period HRS made no demands on the father to provide support for his children[1] who were in HRS foster care and HRS permitted the father to visit with his children once each week, which he did every week. When asked what he and the children did during those visitations, he said:
Well, we did a lot; as much as I could afford  went fishing, took them fishing, and we went to the beach, and went to the amusement park on the Boardwalk and road some rides over there, and took them to the zoo over in Sanford, and took them to the movies, took them to see Bambi, Walt Disney movie. We visited a lot of Burger Chefs and MacDonalds and stuff.
During this parole period the father sought the actual custody of the children and HRS and the father entered into a performance agreement under section 409.168, Florida Statutes, on August 26, 1982. However, the very next day, August 27, 1982, the father was reincarcerated for parole violation and another crime. Thereafter, on December 22, 1982, HRS and the mother entered into a performance agreement. HRS filed an amended permanent placement plan on April 20, 1983, and another on May 4, 1983. After the father was reincarcerated on August 27, 1982, the Ellis' did not bring the children to visit with him and HRS never arranged visitation notwithstanding that under the HRS performance agreement and permanent placement plan, HRS and the foster parents assumed responsibility "for regular and ongoing visitation between the child(ren) and the parent(s)" ... "and that every effort will be made by [HRS] to arrange visitation." The record shows letters from the father dated *748 June 7, 1983, June 16, 1983, October 14, 1983, December 22, 1983, February 8, 1984, and February 29, 1984, to HRS case workers concerning his children. The record also shows long letters from the father to his children dated June 7, 1983, August 16, 1983, December 22, 1983, and February 29, 1984, as well as Christmas cards and Valentine cards.
Petitions for permanent commitment were filed November 7, 1983. As to the father, the petitions alleged
(7)(c) The natural father, William Herbert Wirsing, has failed to comply substantially with a performance agreement entered into on August 26, 1982, as required by Section 409.168, Florida Statutes. FACTUAL BASIS: The natural father has failed to take the specific actions set forth in said performance agreement, which is attached hereto.
(7)(d) The natural father, William Herbert Wirsing, has neglected the said child within the meaning of Chapter 39, Florida Statutes. FACTUAL BASIS: A Dependency Petition was filed in this cause, which alleged that the father neglected the child. On December 12, 1979, the allegations of the Petition were sustained and the Court adjudicated the child dependent.
(7)(e) The natural father, William Herbert Wirsing, has abandoned the said child within the meaning of Chapter 39, Florida Statutes. FACTUAL BASIS: The natural father has neither communicated with nor supported the child from April 1983.
The hearing on the permanent commitment petition centered around the father's failure to perform the performance agreement. The trial court permanently terminated the father's parental rights on the basis that he had failed to perform the performance agreement; that he had abandoned his children; that the father had been incarcerated three times since his sixteenth birthday; that it was in the best interests of the children and that
If said father truly has the children's best interest in heart, rather than his own gratification, then it would appear to this Court that the father should, of his own volition, allow the children to be placed for adoption, rather than seek to exercise his parenthood from a prison cell.
The original opinion herein confirms the permanent commitment and approved the trial court's conclusion that Wirsing had neglected his children, had failed to perform his performance agreement and that by continuing to commit criminal acts had indicated his intention to abandon his children.
The dissent agrees with the majority opinion on rehearing that, as urged in the dissent to the original opinion, the failure of the father to perform a performance agreement because he is incarcerated constitutes a condition and result beyond his control, which under the express provisions of section 39.41(1)(f)1.d., Florida Statutes (1983), cannot be used as a ground for permanent commitment.
As to the charge that the father neglected his children, the petition for permanent commitment alleges in paragraph 7(d):

FACTUAL BASIS: A Dependency Petition was filed in this cause, which alleged that the father neglected the child.[2] On December 12, 1979, the allegations of the Petition were sustained and the Court adjudicated the child dependent.
Thus it can be seen that the charge and proof of neglect by the father as alleged in the November 7, 1983, petition for permanent commitment was, as is often the case, *749 based on the allegation that the fact of neglect had been legally established by the order of December 12, 1979, finding dependency. First, the order of December 12, 1979, finds only that "their mother has neglected them, and their father is incarcerated in the State Prison." Second, based on this fact, at the commencement of the permanent commitment proceedings the father's attorney moved the court to strike paragraph 7-D of the petition for permanent commitment and after argument of counsel the trial court found the allegation of neglect "too broad," the attorney for the state agreed, and the trial court said, "and I'll strike it." Paragraph 7-D is the only allegation in the petition that the father neglected his children. Third, notwithstanding the striking of the only allegation that the father neglected his children, the 1979 petition and order were entered into evidence in the permanent commitment proceedings as proof of neglect (non-support) by the father. This court has explicitly held that "an earlier adjudication or finding of neglect does not satisfy the statute which pertains to the termination of parental rights." In Interest of L.T., 464 So.2d 201, 202 (Fla. 5th DCA 1985). Fourth, the record indicates that the father was neither provided with counsel nor advised of his right to counsel, prior to the December 12, 1979, adjudicatory hearing and dependency order, which adjudication was later used as the basis for the order permanently terminating his parental rights. In Interest of D.B., 385 So.2d 83, 87 (Fla. 1980), the supreme court stated, "We find that a constitutional right to counsel necessarily arises where the proceedings can result in permanent loss of parental custody." "... [C]ounsel will always be required where permanent termination of custody might result." Id. at 91. Section 39.406, Florida Statutes, applicable in dependency cases, provides in part that the "parent shall, prior to an adjudicatory hearing, be advised by the court of his right to counsel... ." See In the Interest of A.T.P., 427 So.2d 355 (Fla. 5th DCA 1983).
In this case the petition did not allege that the father had abandoned his children prior to April, 1983. The exact allegation as to abandonment is in paragraph 7(e) of the petition and states:

FACTUAL BASIS: The natural father has neither communicated with nor supported the child from April 1983. (emphasis supplied)
Thus the allegation of non-support related to the period after April, 1983. The father has been incarcerated continuously since August 27, 1982, and there is ample evidence of his contact with his children between April, 1983, and November, 1983.[3] Accordingly, the non-support alleged in the petition relates to a period of his incarceration in prison, just as did his non-performance of the performance agreement. Obviously HRS carefully selected the six month period between April, 1983, and the filing of the petition for permanent commitment on November 7, 1983, within which to allege and attempt to prove a six month period of parental non-support and non-communication (statutory abandonment as defined in section 39.01(1), Fla. Stat.), for the following reasons: (1) The father's extensive contacts and communications with his children from 1979 through the execution of his HRS performance agreement on August 26, 1982, were well known and well documented by juvenile court and HRS records. (2) The period for accomplishment of both the father's and the mother's performance agreements did not expire until February, 1983. (3) The first amended permanent placement plan was not until April *750 20, 1983. (4) The juvenile court first recognized the father's indigency and constitutional right to counsel and appointed counsel for him on April 25, 1983. (5) After his reincarceration on August 27, 1982, and in violation of HRS and foster parental obligations under the performance agreement, HRS and the foster parents[4] declined to bring his children to visit him in prison as had been done during 1980 and 1981.
There is no basis in the record for assuming that the father, or his attorney, consented to amend the pleadings to change the alleged six month's period of the father's alleged non-communications and non-support from April, 1983, to November, 1983, back to some other indefinite and unalleged six month period. The uncontested evidence clearly and affirmatively shows the father's contact and communications and inability to support resulting from incarceration during each and every six month period since 1979.
It is clear that the charge of neglect in the present case is based on the earlier adjudication of dependency and that this is error in view of the fact that (1) the father was neither provided counsel, nor advised of his right to counsel, at the earlier stage of the proceedings as required by constitutional due process and statute, (2) the earlier adjudication was that the children were dependent because of the mother's neglect and abuse and the father's incarceration, and (3) the earlier adjudication of dependency was improperly used in the permanent commitment hearing as adequate proof of the father's neglect.
It is also clear that the charge of abandonment and non-support related, as did the charge of non-compliance with the performance agreement, to the time "from April, 1983" when the father was incapacitated by virtue of his incarceration.
This case presents the following questions:
Can, or should parental rights be involuntarily and permanently terminated under law solely because that result would be in the best interests of the child? This court answered this question in the negative in Webb v. Blancett, 473 So.2d 1376 (Fla. 5th DCA 1985); this case raises doubts.
When the failure of a parent to comply with a performance agreement executed under section 409.168(3)(a), Florida Statutes,[5] results from incarceration of the parent, is that failure "the result of conditions beyond the control of the parent" so as to prohibit such failure from being used as grounds for permanent commitment under section 39.41(1)(f)1.d; Florida Statutes? This case, on rehearing, appears to answer this question in the affirmative.
When the failure of a parent to personally care for and financially support his child results from the parent's incarceration, can the parent's parental rights be permanently terminated on the ground of neglect or *751 abandonment? This case answers this question in the affirmative and thereby, in substance, directly conflicts with Adoption of Cottrill, 388 So.2d 302 (Fla. 3d DCA 1980) (incarceration is an involuntary circumstance even though criminal acts are voluntary); In the Interest of P.S., R.S., and R.S., 384 So.2d 656 (Fla. 5th DCA 1980) (phrase "while being able" in statutory definition of abandonment, 39.01(1), Fla. Stat., excludes situation of involuntary abandonment); Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977); Harden v. Thomas, 329 So.2d 389 (Fla. 1st DCA 1976) (the effort of a father while in prison under a life sentence to communicate with his children can negate an intent to abandon).
When necessary to provide it with basic necessities, the actual care, custody and control of any child should be placed where the best interests of the child will be served.[6] However, the legal rights of a child in and to its natural parents and the rights of the natural parents in and to a child should not be permanently terminated because of conditions resulting from the parent's ignorance, poverty or imprisonment.
Rehearing should be granted and the order permanently terminating the father's parental rights in this case should be reversed.
NOTES
[1] See e.g., T.S. v. State Dept. of Health and Rehabilitative Services, 464 So.2d 677 (Fla. 5th DCA 1985).
[2] "I was  in prison, and ye visited me not."
[3] When a parent does not send children presents and cards it is always argued as evidence of neglect and abandonment. Why is the reverse not true?
[4] When the spouses or mates of prisoners adequately care for their children such children are usually not considered "neglected" or "abandoned" by the prisoner. This presents a closely related corollary question: Is it legal and fair to permanently forfeit only the parental rights of prisoners who do not have responsible spouses to adequately care for the children?
[5] For a general consideration of this legal principle, see Re Adoption of Cottrill, 388 So.2d 302 (Fla. 3d DCA 1980); Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977); Harden v. Thomas, 329 So.2d 389 (Fla. 1st DCA 1976); Annot., "Parent's Involuntary Confinement  Adoption," 78 A.L.R.3d 712 (1977).
[1] Attorney Dulfer was quoted in the Orlando Sentinal, Friday, July 19, 1985 edition, as characterizing this court's opinion as "the most disgusting thing I ever saw." Dulfer denies the accuracy of the quote, and the reporter confirms it.
[2] Contrary to the dissent herein, neglect was not a determinative issue in this case. Abandonment was alleged in paragraph 7(e) of the petition, it was not stricken, and it was established by proof adduced at the permanent commitment hearing  at which the appellant was represented by counsel.
[3] See also Adoption of Cottrill, 388 So.2d 302 (Fla. 3d DCA 1980).
[4] He was out on parole from February, 1982, until he was arrested for sexual battery on August 27, 1982, for which he is now serving an extended prison term.
[5] During the six-month period herein concerned  from April, 1983, to November, 1983  the evidence indicates appellant wrote two letters to his children.
[1] This case is one of many where HRS places children in foster care, makes absolutely no effort to meet its duty under sections 409.2561 and 409.2564, Florida Statutes, to obtain support from the parents but sandbags them. HRS then charges the parents with neglect or abandonment because they did not volunteer to pay HRS support for their children while the children were in the custody of HRS, usually contrary to the desire of the parents. An Associated Press release from Tallahassee published October 9, 1985, states that HRS is considering requiring such parents to help pay the bills for children in foster care.
[2] This allegation is not correct. The dependency petition alleges various acts and neglect by the mother and then adds, "William Wirsing (natural father) is incarcerated." The father's attorney, taking a deposition used as evidence in the final hearing, directed the attention of the witness, Maria L. Miller, a representative of HRS, to a copy of the original detention petition and questioned her as follows: "Q. Anywhere in that petition that was filed by HRS was there any allegation of abuse, neglect, or abandonment concerning Mr. Wirsing?" A. No." "Q. Has HRS ever filed a petition alleging Mr. Wirsing has abused, abandoned, or neglected his children?" "A. No."
[3] The father's attorney asked the HRS representative, Marie L. Miller, the basis for the allegation in Paragraph 7(e) of the permanent commitment petition that the father had abandoned his child. The dialogue continued: "A. Well, the basis of the statement would be if he  well, I am a little confused on this, because the law states that if the natural parent has not had any contact with the children in six months, then that means they're abandoned." "Q. But you stated that he's had at least four contacts in the last six months." "A. Yes." ... "Q. What facts support an allegation of abandonment as far as you are concerned in your records?" "A. Well, that he hasn't had any personal contact with the children for six months." "Q. And is that because he's been incarcerated, to the best of your knowledge?" "A. Yes."
[4] The foster parents, the Ellis', indicated that they would continue to care for the Wirsing children whether or not HRS has the Wirsing parental rights terminated, but the Ellis' are also the proposed adoptive parents.
[5] Failure to substantially perform such a performance agreement is a condition precedent to permanently terminating parental rights. See Burk v. H.R.S., 476 So.2d 1275 (Fla. 1985); Gerry v. H.R.S., 476 So.2d 1279 (Fla. 1985); Yelverton v. H.R.S., 475 So.2d 1038 (Fla. 5th DCA 1985). In Interest of C.B., 453 So.2d 220 (Fla. 5th DCA 1984), although a parent had been found to have abused her child, the parent argued that under section 409.168, Florida Statutes, she was entitled to a performance agreement before her parental rights could be permanently terminated under section 39.41(1)(f)1.a., Fla. Stat. This court rejected the parents position stating that it "would produce absurb results." In Burk v. Dept. of HRS, 476 So.2d 1275 (Fla. 1985), the Florida Supreme Court agreed with the parents interpretation of section 409.168, Florida Statutes, and disagreed with and quashed the decision in In Interest of C.B. Because under legislated public policy the objective is "the reunification of families who have had children placed in foster homes or institutions" (§ 409.145(1)(b), Fla. Stat.), and not the permanent termination of parental rights, the legislative mandate in § 409.168(3)(a), Fla. Stat., of a peformance agreement in every case, is not only a legislative prerogative but is reasonable and proper. I do not agree with the view that the decision of our supreme court in Burke v. HRS is "regrettable", nor that it leads to absurb consequences, nor that it is a "saddle" to be borne until removed by corrective legislative action.
[6] In a letter to the court from prison dated December 10, 1979, the father in this case recognized this fact and agreed that, because of his wife's neglect of his children, in their best interests and welfare they should be placed in foster care which he described as a very unfortunate but necessary procedure.