702 So.2d 1343 (1997)
E.W.R., Natural Father of K.A.R., A Minor, Appellant,
v.
W.T.J., Adoptive Father of K.A.R., A Minor, Appellee.
No. 96-3038.
District Court of Appeal of Florida, First District.
December 12, 1997.
George Drumming, Jr., Tallahassee, for appellant.
Tann H. Hunt, Tallahassee, for appellee.
WOLF, Judge.
This is a timely appeal of a final order terminating the parental rights of the natural father and an order granting a petition for adoption which was rendered the same day. The issue is whether the trial court erred in finding that appellant's conduct constituted abandonment of his minor child within the meaning of section 63.032(14), Florida Statutes (1995). We are unable to distinguish this case from the case of In Interest of B.W., 498 So.2d 946 (Fla.1986), which determined that an incarcerated father's failure to provide support as a result of incarceration and the failure to communicate with the child during incarceration as a result of a third party's intervention does not constitute abandonment justifying termination of parental rights. We must, therefore, reverse. However, in light of the seriousness and timing of the offenses committed by the father and the length of the sentence of imprisonment, we feel that the supreme court should revisit the issue and determine whether these factors may be considered in determining abandonment which will support termination of parental rights.
The appellant, E.W.R., had been married to K.A.R.'s mother for approximately three months when she became pregnant. In August *1344 1991, when K.A.R.'s mother was 4½ months pregnant, she learned that E.W.R. had been arrested for kidnapping and rape. The appellant was convicted of three separate sexual batteries and sentenced as a habitual sex offender in February 1992. Since his incarceration in August 1991, the appellant has provided no financial support for the child. On June 30, 1992, K.A.R.'s mother filed for a divorce which was granted in September 1992. In October 1992, she married appellee, W.T.J.
On March 25, 1996, W.T.J. filed a petition to adopt the child who was then about four years old and had been living with him and the natural mother since infancy. The mother consented to the adoption on March 25, 1996, and on March 26, 1996, she petitioned the court for termination of parental rights of the natural father. The petition for termination sought relief based on the following allegations:
11. The birth father is a man of at least average intelligence who made certain choices with obvious probable consequences.
12. The choices that this birth father made were kidnapping, sexual battery and aggravated assault. The consequence that followed his choices was a jail sentence of twenty (20) years. Actual time expected to be served is eleven (11) years.
13. The birth father committed these crimes after finding out that the Petitioner was pregnant with their child. Therefore, he chose to abandon his child. The Petitioner and the minor child were given no financial and emotional support because of the birth father's conduct before the birth of the minor child. If possible, the Petitioner and the minor child received less than no support. They suffered deficient support because the natural father deliberately took away their well-being by his choices.
14. "A finding of abandonment under Chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent's legal custody or relationship with the child." In re Adoption of Doe, 543 So.2d 741, 744 (Fla.1989).
(Emphasis in original).
Evidence adduced at the final hearing established that appellant kidnapped a woman and committed sexual battery for which he was subsequently sentenced to 20 years. During his incarceration, appellant has not provided financial support; however, he testified that he has no resources, and appellee presented no evidence to refute these allegations. Appellant's presumptive release date is not until 2008 when the child will be 17 years old.
The record shows that the mother apparently maintained contact with the appellant for a period of time after the child was born, and she brought the child to see appellant at the Madison Correctional Institute about every other week for the first six months of the child's life. When the child was about six months old, however, the mother informed the appellant that she wanted him to terminate his contact with the child and to stop sending the child letters and cards to her house. The record shows that up until the mother terminated contact, the father had continued to attempt communications with the child, and that following the mother's request, he took it upon himself to send all continuing communications through his mother by sending cards and letters for the child to his mother's home to be kept for the child. The natural father testified that in addition to cards and letters, he had also sent some gifts to the child which were being held at the paternal grandmother's house as well. There was in fact a stack of 38 cards and letters at the hearing which the appellant identified as things that he had sent to his daughter in the past four years.
The natural mother testified that although the child has continued to visit with the paternal grandparents, she does not want the paternal grandmother to show the child the father's cards and letters because the child "has no idea this man is alive." The mother also asked the paternal grandparents not to share with the child the fact that the appellant is the child's father.
*1345 The court terminated appellant's parental rights and found that the appellant abandoned his daughter and was a potential danger to the child. An expert witness testified that studies of sexual offenders indicate a high rate of recidivism, and therefore, appellant could be a danger to his daughter in the future. The trial court's finding that appellant is a potential danger to the child appears to be based on this testimony. We do not find that the generalized testimony of the expert would support this finding or constitute clear and convincing evidence to support termination without further evidence of potential harm; however, the issue of abandonment is somewhat more difficult.
In Interest of B.W., 479 So.2d 740 (Fla. 5th DCA 1985), rev'd, 498 So.2d 946 (Fla. 1986), the fifth district attempted to create case law which established that committing a criminal act for which incarceration was a known result, demonstrated a lack of interest in the welfare of a man's children and indicated an intent to abandon them. Id. at 741. There, the Fifth District Court of Appeal said, "It is cruel and inhuman to force children to rely upon as a father a person who has chosen to spend his life in prison and only send letters to purport to fulfill his role as a father." Id. That reasoning, however, was struck down by the supreme court in In Interest of B.W., 498 So.2d 946 (Fla. 1986), where the supreme court held that an incarcerated father's inability to support his children due to incarceration was not abandonment justifying termination of parental rights, and that an incarcerated parent's failure to communicate with children which was caused by a refusal of foster parents and caseworkers to bring children to prison for visits was not abandonment justifying termination of parental rights. There, the supreme court stated,
[S]ince as a practical matter, an incarcerated parent is unable to assume all parental duties, his failure to "evince a settled purpose" to assume all duties cannot support a finding of abandonment.... However, his efforts, or lack thereof, to assume his parental duties through communicating with and supporting his children must be measured against his limited opportunity to assume those duties while imprisoned.
Id. at 948.
Although under B.W. we are forced to reverse, we are prompted to ask whether blood is thicker than common sense and the best interests of the child. In the instant situation, the child had no contact prior to appellant's incarceration, and she will have no meaningful contact until at least the age of 17 when appellant may be released. The child does, however, have a stepfather willing to adopt her. We, thus, certify the following question:
WHETHER THE CASE OF IN INTEREST OF B.W., 498 So.2d 946 (Fla.1986), PRECLUDES A FINDING OF ABANDONMENT WHERE THE NATURAL FATHER VOLUNTARILY COMMITS A CRIME PRIOR TO THE BIRTH OF HIS CHILD WHICH REASONABLY COULD BE EXPECTED TO RESULT IN IMPRISONMENT DURING THE ENTIRE OR A SUBSTANTIAL PORTION OF THE TIME THAT THE CHILD WILL BE A MINOR.[1]
VAN NORTWICK, J., concurs.
BOOTH, J., specially concurring with written opinion.
BOOTH, Judge, specially concurring.
This court is bound to follow the Florida Supreme Court's decision in In Interest of B.W., 498 So.2d 946 (Fla.1986), there being no apparent basis for distinguishing that case from this one. In both cases, the fathers were convicted of, inter alia, sex offenses, and were serving extended prison terms. The children in both cases are also "imprisoned" and held without hope of adoption. In the instant case, the trial court considered the length of imprisonment and the fact that the father was an habitual sex offender as bearing on his availability as a parent. In reversing the trial court, as required by the B.W. case, we are applying an arbitrary rule contrary to the welfare of the child.
*1346 The Legislature recently enacted chapter 97-226, Laws of Florida, effective October 1, 1997. Under the amended statute, termination of parental rights may be sought under the following, inter alia, circumstances:
(d) When the parent of a child is incarcerated in a state or federal correctional institution and:
1. The period of time for which the parent is expected to be incarcerated will constitute a substantial portion of the period of time before the child will attain the age of 18 years;....
The amended statute is not retroactive,[1] however, it is unquestionably remedial and an expression of public policy. As such, it supports the trial court's consideration of long-time incarceration along with other factors in balancing the claim of parental rights against the best interest of the child. But for the earlier supreme court decision in B.W., this court could affirm the trial court's ruling below.
NOTES
[1] The Legislature enacted chapter 97-226, Laws of Fla., effective October 1, 1997, which would specifically allow for termination of parental rights under the circumstances of this case.
[1] Chapter 97-226, Laws of Florida, amended effective October 1, 1997, applies to any person incarcerated or sentenced after that date. Appellant herein was sentenced prior to its effective date.